IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DARON D. HOWARD-BEY,         )
a.k.a., Daron Durane Howard, AIS #159809,  )
                                )
       Plaintiff,           )
                                )
  v.                 )        CIVIL ACTION NO. 2:17-CV-517-MHT
                                )
WONDA CRAFT, et al.,[1]       )
                                )
       Defendants.      )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I. INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by Daron D. Howard-Bey ("Howard-Bey"), a pre-trial detainee formerly incarcerated in the Covington County Jail, against Nurse Craft, Southern Health Partners, the jail's health care provider, and Scott Racz, a Sergeant with the Covington County Sheriff's Department. In this complaint, Howard-Bey alleges that the medical defendants acted with deliberate indifference to his medical needs by "playing with [his] meds" and further asserts that Sgt. Racz failed to transport him to court proceedings. Doc. No. 2 at 1-2. Howard-Bey seeks preliminary injunctive relief by way of a motion for preliminary injunction. The court therefore ordered that the defendants file responses to this motion. Doc. No. 6. The defendants filed special reports, supported by relevant evidentiary materials, in which they assert that Howard-Bey is not entitled to the requested preliminary injunctive relief.

---

[1]The documents filed by the medical defendants establish that defendant Craft's correct name is Wanda Craft.

Upon review of the motion for preliminary injunction and responses thereto filed by the defendants, the court concludes that this motion is due to be denied.

## II. STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court...." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). This court may grant a preliminary injunction only if Howard-Bey demonstrates each of the following prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the requested injunctive relief may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest. *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion' as to the four requisites." *McDonald's*, 147 F.3d at 1306; *All Care Nursing Service, Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion). The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir.

1994); *see also Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). "'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.' *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir. 1990)." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

## III. DISCUSSION

The defendants maintain that Howard-Bey is not entitled to preliminary injunctive relief as he has failed to demonstrate each of the requisite elements for issuance of a preliminary injunction. Sgt. Scott Racz asserts that his "job duties do not consist of transporting inmates to and from Court. The Covington County Jail transports inmates to Court when the Courthouse calls or faxes a list that specifies which inmates to bring." Doc. No. 18-3 at 2-3. Nurse Craft addresses Howard-Bey's claims, in relevant part, as follows:

> During the time I have been employed by SHP, Plaintiff has received medical attention for every medical condition which he has brought to the attention of Jail personnel.
> Nurses at the Jail have no authority to prescribe medications. All medications provided by nursing personnel to the Plaintiff at the Jail are prescribed by the Medical Director/Provider, whose prescribing and dosage instructions are followed by the nurses at the Jail.
> Based upon my treatment of the Plaintiff and review of his medical records, it is my opinion that all treatment provided to the Plaintiff by myself and the SHP nursing staff was prompt, appropriate and within the standard of care. On no occasion was the Plaintiff ever denied medical care, nor was any member of the medical staff ever indifferent to any of the Plaintiff's medical needs.
> . . . .
> I have reviewed the medical chart of the Plaintiff.

Plaintiff was booked into the Jail on February 12, 2017.

On February 13, 2017, I conducted a History and Physical examination of Plaintiff. Plaintiff reported that he had been treated for hypertension, bipolar disorder, GERD (gastroesophageal reflux disease), and polymyositis (a muscle disorder). He stated that he was unsure what medications he was currently taking, but listed prednisone (a steroid), ASA (aspirin) and hydrocodone (a narcotic pain medication). He reported that he was allergic to a steroid medication, the name of which he could not remember. Plaintiff stated that he had been treated at Andalusia Regional Hospital in Andalusia, Alabama and also at Southeast Medical Center in Dothan, Alabama. His pulse was 81, blood pressure was 148/80, temperature was 97, respirations were 20, and his oxygen saturation was 97%. He was alert and cooperative, his lung sounds were clear, his skin color and turgor were good, his extremities showed no edema, and his pedal pulses were positive. He stated that he obtained his medications from the Andalusia Health Department. I contacted the Andalusia Health Department, and was informed that they did not dispense medications. Plaintiff could not provide the name of a pharmacy from which I could obtain his current prescription information.

Medical records obtained from Southeast Alabama Medical Center revealed that Plaintiff had been diagnosed in 2010 with acute respiratory failure, hypertension, hypothyroidism, and polymyositis.

Plaintiff was booked out of the Jail on March 20, 2017.

Plaintiff was booked into the Jail again on May 28, 2017.

On May 31, 2017, Nurse Michelle Chickosky ("Nurse Chickosky") conducted a Receiving Screening examination of Plaintiff. Plaintiff reported that he had been treated for hypertension, bipolar disorder, and polymyositis. He stated that he had been prescribed the medication Amlopidine (for hypertension), but had not taken it in six months. He reported that he was allergic to the medication Solumedrol. Plaintiff stated that his primary care provider was Martha Reid, CRNP, and that his pharmacy was Rite Aide, in Opp, Alabama. He stated that his only medication was Amlodipine, 10 mg (a medication for hypertension).

On May 31, 2017, Dr. Barber issued medical orders for Tolnaftate (antifungal) cream, to be applied as directed.

On June 2, 2017, Nurse Chickosky was informed by Martha Reid's office that Plaintiff was not a current patient there. She contacted Rite Aid, and spoke with the Pharmacist. The pharmacist informed her that Plaintiff was last dispensed Amlodipine for hypertension in March, 2016.

On June 4, 2017, Dr. Barber reviewed Plaintiff's chart and initialed the Medication Reconciliation Sheet which had been received from Southeast Alabama Medical Center on February 15, 2017. She did not issue any medical orders for medications at that time.

On June 11, 2017, Plaintiff submitted a sick call request stating, I would like to request to see nurse about my meds soon as possible." (*sic*.). I saw Plaintiff in the Jail medical office on that day. He informed me that his primary care provider, Martha Reid, was a nurse practitioner with Mizelle Hospital in Opp, Alabama. I noted that his temperature was 96.8, his respirations were 50, blood pressure was 140/70, and oxygen saturation was 99%. I then placed Plaintiff's chart in the designated area for Dr. Barber to review upon her next Jail visit.

On June 14, 2017, Plaintiff was seen in the Jail medical office by Nurse Chickosky. Plaintiff complained of joint pain, and requested to see the doctor about his medications. Nurse Chickosky completed a Clinical Pathway/Patient Clinical Data Form. She noted that Plaintiff's blood pressure was 138/82, his pulse was 58, respirations were 20, oxygen saturation was 99%, and temperature was 97. Nurse Chickosky conducted a physical assessment, and noted that Plaintiff's skin was warm and dry, his abdomen was soft, bowel sounds were present, skin turgor was good, respirations were even and unlabored, grips were good and his pupils were equal and reactive. Nurse Chickosky contacted Dr. Barber, who issued medical orders for Motrin, 800 mg by mouth twice per day for seven days. She noted that Plaintiff had requested to see Dr. Barber about his medications.

On June 15, 2017, Plaintiff submitted a sick call request stating, "Severe Migraine, muscle spasm and joint pain. You told me 3 to 4 days ago you would get my meds squared away." Nurse Chickosky received the request on June 15, 2017, and checked Plaintiff's vital signs. She noted that his temperature was 97.8, respirations were 18, pulse was 80, and blood pressure was 140/80. She noted that Plaintiff claimed to be taking medications that were not the same as those he had been prescribed. She placed Plaintiff's chart aside for Dr. Barber to review.

On June 17, 2017, Dr. Barber reviewed Plaintiff's chart and issued medical orders for the following medications: Norvasc 5 mg, one dose by mouth per day, Synthroid 0.05 mg, on dose by mouth per day (for hypothyroidism), Flonase 2 puffs daily in each nostril and Pulmicort nebulizer twice per day (for asthma). She ordered a tapered dose of Prednisone, starting with 40 mg by mouth, once per day for three days, then 30 mg, once per day for three days, then 20 mg per day for three days, then a maintenance dose of 10 mg, once per day (for polymyositis). She also ordered ibuprofen, 800 mg by mouth twice per day for 10 days (for pain and inflammation), Robaxin 75 mg by mouth twice per day for 10 days (a muscle relaxant), and Vistaril, 50 mg by mouth twice per day for 5 days (an antihistamine).

The nursing staff obtained the medications and provided them to Plaintiff as prescribed by Dr. Barber.

As Dr. Barber ordered, Plaintiff was provided Norvasc, Flonase, Pulmicort and Prednisone daily from June 19, 2017 through June 30, 2017. He was provided Vistaril from June 19, 2017 through June 23, 2017 (five days). He was provided Robaxin and ibuprofen from June 19, 2017 through June 28, 2017 (ten days).

On June 29, 2017, Plaintiff submitted a sick call request, stating "Migraine headaches, chest pains, muscle spasms and leg cramps. I have not been given my medication for my illness in a month, polymyosidis, hypo-thyroid, Gerd, Hy blood pressure, schitzafrania and Bi-polar, Where are my meds." (*sic*.).

On June 29, 2017, I saw Plaintiff in the Jail medical office. Plaintiff was upset that he had not been given ibuprofen and Robaxin that day. He stated that he had been diagnosed with polymyositis since 2010. He also stated that he was having muscle spasms in his chest. I completed a Clinical Pathway/Patient Clinical Data Form. I noted that Plaintiff was showing no signs of pain at that time. He stated that he was used to this and that he used to get Robaxin every night in prison. He added that Robaxin was the only thing that helped his polymyositis. I observed that his blood pressure was 140/78, pulse was 61, oxygen saturation was 99%, and temperature was 97.8. He was calm, alert and oriented, with a steady gait. His pupils were equal and reactive. His abdomen was soft, bowel sounds were present, and respirations were even and unlabored. His skin was warm and dry, grips were good, and pedal pulses were present. I explained to Plaintiff that the medical orders for ibuprofen and Robaxin had expired. I also informed Plaintiff that I could not prescribe medications, but that I would provide his chart to Dr. Barber for review. I placed Plaintiff's medical chart in the designated area for Dr. Barber to review on her next visit to the Jail.

On July 5, 2017 at the morning pill call, Plaintiff threw away his dose of Prednisone. He stated that he only took 5 mg of Prednisone. Nurse Chickosky informed Plaintiff that he was given a 10 mg tablet, which was what the doctor had prescribed.

On July 5, 2017, Plaintiff submitted a sick call request, stating, "Migraine headaches, muscle spasms, Gerd, an my toes have began to throbb an my feet feel like I'm walking on pins. An I can't sleep without my meds" (*sic*.). Plaintiff stated that he had been experiencing the problem "Month – After Head nurse Ms. Wonda Craft took me off my meds." (*sic*.).

Plaintiff's chart was placed in the designated area for review by Dr. Barber, who reviewed the chart on July 5, 2017. Dr. Barber issued medical orders for Robaxin 750 mg by mouth twice per day for 21 days, ibuprofen 800 mg by mouth twice per day for 21 days, and Zantac 150 mg by mouth twice per day.

In accordance with Dr. Barber's orders, the nursing staff provided Plaintiff with ibuprofen and Robaxin from the evening of July 5, 2017 through the morning of July 26, 2017.

Plaintiff was seen in the Jail medical office on July 6, 2017 by Nurse Chickosky. Plaintiff complained of headaches, muscle spasms and GERD. He also stated that he was having numbness to his feet. He requested something to help him sleep, and asked for some additional psychiatric medications. Nurse Chickosky informed Plaintiff that the medical staff had contacted multiple doctors and pharmacies, and had identified no other medications that Plaintiff could take at the Jail. Plaintiff indicated that he understood. Nurse Chickosky instructed him to notify medical if his symptoms worsened or persisted. She noted that Plaintiff's temperature was 97, respirations were 18, pulse was 63 and blood pressure was 130/78.

On July 8, 2017, Plaintiff submitted an Inmate Grievance Form, stating, "According to protocol Ms. Craft continues to overstep the boundaries of a nurse.  According to United States Code Service a person pays 3 dollars for visit an a dollar for meds so that's $4.00 per money order. So explain how Ms. Craft came back to work Saturday an took off another payment. Firer her things have gone to far. People lives are at stake and Healthcare is funded by the State and Federal Fund." (*sic.*).

I had Plaintiff brought to the Jail medical office. I explained to Plaintiff that I was not responsible for establishing medical co-pay policies, but rather these were set by the county.

I contacted my supervisor, Jeremy Howell, LPN, who responded to Plaintiff's grievance in writing, stating that "Co-pays are set by the County, and everyone will receive medical care and meds regardless of financial status."

On July 27, 2017, Plaintiff submitted two sick call requests. The first request stated, "I want to request to see the nurse my toes have sores between them an they are sore. I also need them cut". The second request stated, "I also need a eye doctor appointment thank you have a blessed day" (*sic.*).

On July 29, 2017, I saw Plaintiff in the Jail medical office. Plaintiff complained that his medications had run out. He complained that he had been having chest pain since his Robaxin and ibuprofen had been stopped, and stated that he needed the medications for his polymyositis. I observed no open areas or wounds between his toes.  He stated that he had been told to put in a sick call request to clip his nails. I informed him that the medical staff did not have any nail clippers. I informed Plaintiff that I would provide his chart to Dr. Barber for review. I then placed Plaintiff's medical chart in the designated area for Dr. Barber to review.

On July 30, 2017, Plaintiff came to his cell door for pill call. He made no complaints, and showed no limited range of motion. Plaintiff inquired

where was his Robaxin and ibuprofen. I informed him again that only the doctor could order medications.

On August 2, 2017, Plaintiff refused to take his morning medications. He stated that he did not want the medications. He was informed to submit a sick call [request] if he needed, and was advised to take his medications.

On August 4, 2017, I spoke in person with Dr. Barber regarding Plaintiff's request for ibuprofen and Robaxin. I informed her that Plaintiff claimed these were the only things that helped his polymyositis. Dr. Barber issued medical orders for both medications for a fourteen-day period.

On August 7, 2017, Plaintiff refused to accept his morning medications. He did not provide a reason for the refusal, and would not sign a refusal form.

On August 8, 2017, Plaintiff refused to accept his morning medications, stating that he "Didn't want it". He would not sign a refusal form.

On August 9, 2017, Plaintiff refused to get up to receive his morning medications. He would not sign a refusal form.

On August 12, 2017, Plaintiff refused to accept his morning medications. He did not provide a reason for the refusal, and would not sign a refusal form.

Based upon my treatment of the Plaintiff and review of his medical records, it is my opinion that all treatment provided to the Plaintiff by the SHP nursing staff was appropriate and within the standard of care.

During Plaintiff's incarceration in the Jail, he has been provided medical treatment for all medical conditions as submitted on sick call slips listed in Plaintiff's medical record.

During Plaintiff's incarceration, the nursing staff has followed all of the orders of the Medical Director/Provider, including orders prescribing medications.

Neither I nor any of the SHP nursing staff have "played" with Plaintiff's medications or taken any action that caused him to suffer.

Doc. No. 16-1 at 3-11 (internal paragraph numbering omitted).

Turning to the first prerequisite for issuance of preliminary injunctive relief, the court finds that Howard-Bey has failed to demonstrate a substantial likelihood of success on the merits of his claims. Howard-Bey likewise fails to establish a substantial threat that he will suffer the requisite irreparable injury absent issuance of the requested preliminary injunction. The third factor, balancing potential harm to the parties, weighs more heavily

in favor of the defendants as issuance of the injunction would adversely impact the ability of medical personnel to provide treatment in accordance with their professional judgment. It is likewise clear that issuance of the injunction would impede jail officials in managing the transport of inmates to court proceedings. Finally, the public interest element of the equation is, at best, a neutral factor at this time. Thus, Howard-Bey has failed to meet his burden of demonstrating the existence of each prerequisite necessary to warrant issuance of preliminary injunctive relief.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff be DENIED.

2. This case be referred back to the undersigned for additional proceedings.

On or before October 6, 2017 the parties may file objections to the Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made. Frivolous, conclusive, or general objections to the Recommendation will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v.*

*Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885

F.2d 790, 794 (11th Cir. 1989).

DONE this 22nd day of September, 2017.

/s/     Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE